# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF MASSACHUSETTS

|  |  |
|---|---|
| HYEWOONG YOO | ) )<br>) )<br>) ) |
| Plaintiff, | ) ) |
| v. | ) )   Civil Action No. 1:19-cv-10281-ADB |
| KOREAN BROADCASTING SYSTEM, | ) ) |
| Defendant. | ) )<br>) )<br>) |

## MEMORANDUM IN SUPPORT OF DEFENDANT
## KOREAN BROADCASTING SYSTEM'S MOTION TO DISMISS

## I.    INTRODUCTION

Defendant Korean Broadcasting System ("KBS") submits this memorandum in support of its motion to dismiss Plaintiff Hyewoong Yoon's Complaint pursuant to Fed. R. Civ. P. 12(b)(1) and the doctrine of forum non conveniens.

*First*, this Court lacks subject matter jurisdiction over this case under the Foreign Sovereign Immunities Act ("FSIA"), because KBS is the public broadcasting network of the Republic of Korea (a/k/a, "South Korea") and is funded by the South Korean government.  The FSIA provides a statutory presumption that a foreign government and its instrumentalities are immune from suit in the United States.  As none of the statute's enumerated exceptions apply, this lawsuit should be dismissed for want of subject matter jurisdiction.

*Second*, even if the Court had subject matter jurisdiction, it should nonetheless exercise its authority to dismiss this case pursuant to the doctrine of forum non-conveniens.  Simply stated, the gravamen of Plaintiff's claims, the location of the evidence, the ability to secure

compulsory attendance of witnesses at deposition and trial, the needless costs imposed to

conduct discovery, and the availability of an adequate alternative forum in South Korea weigh in

favor of adjudicating this matter in that country.  Notably, here, the analysis of these factors is

not merely hypothetical, because ***approximately three months prior to filing this lawsuit,***

***Plaintiff filed a nearly identical suit against KBS in Korea.***

## II.   FACTUAL BACKGROUND

### A.   KBS is an Instrumentality of the Republic of Korea.

KBS is Korea's national public broadcaster. *See* Affidavit of Jae-eun Shin, Ex. 1 ¶ 3.  It

operates in radio, television, online, and other media services.  *Id.*  It is a public corporation

that is funded by the Korean government.  *Id.*  KBS has always been a public corporation and

citizen of Korea from its inception to the present.  *Id.*

KBS was founded as Korea's national public broadcaster to establish a culture of fair

and objective broadcasting in Korea and to provide effective broadcasting services both at

home and abroad, pursuant to Article 43 of the Broadcasting Act (the "Act").  Ex. 1 ¶ 4.  (A

true and accurate copy of the Act translated to English is attached to Mr. Shinn's Affidavit as

Exhibit 1.a.).  According to Article 44 of the Act, KBS must be impartial and serve the public

interests. *Id.* In particular, according to Article 54(1), Item No. 5 of the Act, KBS must

provide overseas broadcasting services to promote Korea's relationships and cultural and

economic exchanges with other countries as well as social educational broadcasting services

for Korean nationals who reside abroad.  *Id.*

The President of South Korea has the power to appoint the President of KBS and its

Board of Directors.  *Id.* 5.  Those procedures are addressed in Articles 46 and 50 of the Act.  *Id.*

The Board of Directors consists of 11 non-permanent directors, each recommended to the

President of South Korea by the Korea Communications Commission ("KCC"), which has the responsibility for regulating broadcast and communication services in South Korea. *Id.* Prior to becoming the President of KBS, the individual nominated must go through a confirmation process before the National Assembly, which is the South Korean equivalent of Congress. *Id.* In addition to this appointment process, the finances of KBS are closely monitored by the government with Article 59 of the Act mandating that KBS submit an annual operation plan and statement of accounts to KCC each year regarding its finances. *Id.* ¶ 6. The Board of Audit and Inspection of Korea ("BOAI"), whose authority and responsibility under the South Korean Constitution is to audit the accounts of government and public institutions, reviews these reports. Upon BOAI's review, the statement of accounts is submitted to the National Assembly for final approval. *Id.*

KBS was founded with the sole capital investment of KRW (South Korean won) 300 billion by the Korean government.  *Id.* ¶ 7. KBS's expenses are covered by revenue sources specified in Article 56 of the Act, including television licensing fees, advertising revenues, and government subsidies for overseas broadcasting.  *Id.*  Under Article 65 of the Act, the licensing fees that KBS can charge are approved by a resolution of the Board of Directors with final approval required by a majority vote of the National Assembly.  *Id.*  Furthermore, under Article 5(2) of the Act, commercials that KBS may broadcast are limited to those entrusted by the Korea Broadcast Advertising Corporation, which is the only government-funded public media representative in Korea.  *Id.*  In addition, funds provided by the government are specifically earmarked for KBS to deliver its programming to disabled individuals – *e.g.,* closed captioning. *Id.* ¶ 8.  Finally, Article 53 of the Act prohibits KBS employees from having any other paying jobs, and the salary data for KBS employees are posted on its website. *Id.* ¶ 9.

### B.      Plaintiff's Previously Filed Lawsuit in South Korea

On November 20, 2018, Plaintiff (along with Plaintiff's father, HongGeun Yoon, and

Genesis BBQ) filed a complaint in South Korea ("South Korean Complaint" or "South Korean

Lawsuit") against KBS and two affiliated individuals, JooHyung Lee and SeYeon Lee. *Id.* ¶¶ 12-

14; *see also* Ex. 2 (South Korean Complaint, original and English translation). The South Korean

Complaint asserts that KBS, through its agents, (i) publicized false information stating that

Genesis BBQ's CEO/Owner had for years used corporate funds to support the overseas

education of Plaintiff, and (ii) Plaintiff was paid by Genesis BBQ without performing any work

for the company. *See* Ex. 1 ¶ 14; Ex. 2, ¶¶ 1-2. The South Korean Complaint further alleges that

on November 15-16, 2018, KBS and its agents publicized this allegedly false information on

"KBS News," and the report was subsequently dispersed through various internet websites.  Ex.

2 ¶ 2.  The South Korean Complaint asserts that KBS failed to exercise diligence before

reporting its story, which resulted in reputational and financial harm to plaintiffs. Ex. 2 ¶¶ 3-4.

The South Korean Complaint seeks money damages and a corrective broadcast by KBS. *Id.* ¶¶ 4-

5.

On November 9, 2018, prior to filing the South Korean Complaint, Plaintiffs sought a

preliminary injunction against KBS seeking to bar KBS from broadcasting its news report on the

basis that it contained the same false information alleged in the Complaint filed in this Court

(discussed in further detail, below).  Ex. 1 ¶ 13. The Seoul Southern District Court issued an

Injunction Order, which permitted KBS to broadcast its news report but ordered KBS to reflect

Plaintiffs' opposing views.  *Id.*  (A true and accurate copy of the Injunction Order in original

Korean and translated to English is attached to Mr. Shinn's Affidavit as Exhibit 1.b.).  The Seoul

Southern District Court also ruled that KBS would have to pay KRW 20 million each time that

KBS violated the Injunction Order. *Id.*  Plaintiffs subsequently filed a petition in the Seoul

Southern District Court to enforce the Injunction Order, claiming KBS violated its terms. *Id.* ¶

15. Plaintiffs also filed a criminal complaint against Ms. Se-yeon Lee, Mr. Ju-hyung Lee, and

Mr. Yang Sung-dong, President & CEO of KBS, alleging they committed criminal defamation

under the Korean Criminal Code.  *Id.*  In addition, a related criminal prosecution is pending

against plaintiff Hong-geun Yoon for embezzlement of company funds to pay for his son's

education in the United States. *Id.* ¶ 16.

        **C.**      **South Korean Court System and Judicial Process**

South Korean courts provide an effective procedural framework for the resolution of

cases that is entirely fair to all parties involved. The court system is composed of three levels –

court of first instance (trial court), court of second instance (appeals court), and Supreme Court

(highest court). Ex. 1 ¶ 23. A civil action is commenced through the filing of a complaint that is

served on the defendant(s) who then have thirty (30) days to respond. *Id.* ¶ 24A-B. Once an

answer is provided, a court of first instance will conduct a series of formal hearings designed to

accumulate evidence and testimony. *Id.* ¶ 24C-D. Prior to these hearings, the court may elect to

conduct preparatory hearings to clarify the issues presented in preparation for the formal

hearings.  *Id.* ¶ 24C.  The parties are permitted to seek leave from the court to issue document

production orders and/or fact clarification requests to develop the record.  *Id.* ¶ 24D.  This

includes using the court's authority to compel parties and non-party witnesses to testify. *Id.* Once

the court of first instance determines it has reviewed sufficient evidence and testimony, it will

issue a written opinion based on the evidence and written submissions of the parties. *Id.* ¶ 24E.

The parties to a civil action have a right to appeal to the court of second instance. *Id.* ¶

24F. The standard of review is *de novo*, and the court of second instance is permitted to receive

new evidence and arguments on the merits of the claims and defenses. *Id.* A series of formal hearings are conducted subject to the court's discretion. *Id.* Once a formal decision on the appeal is issued, either party may seek final review by the Supreme Court for any apparent legal errors. *Id.* ¶ 24G. The standard of review for the Supreme Court is generally limited to review of the legal issues. *Id.*

### D.   Plaintiff's Complaint Filed in This Court

On February 13, 2019, nearly three months after he filed the Korean Lawsuit, Plaintiff filed the present action. As he did in his South Korean Complaint, Plaintiff alleges that KBS and its agents ran the same series of news reports on television in South Korea that contained false information, causing Plaintiff the same financial and reputational harm as alleged in the South Korean Lawsuit. Compl. ¶¶ 10-13, 18-21.  Plaintiff further alleges that KBS' agent, SeYeon Lee,[1] recorded a telephone conversation with Plaintiff without his permission. *Id.* ¶¶ 14-17.

Based on the above allegations, Plaintiff brings claims for a violation of the Massachusetts Wire Tapping Statute, G.L. Ch. 272 § 99(Q) ("Wiretap Statute") (Count I), Defamation/Libel (Count II), and Trade Libel (Count III).

Plaintiff seeks statutory damages pursuant to the Wiretap Statute, and he further claims that as a result of the allegedly defamatory broadcast in South Korea, Genesis BBQ sustained a revenue drop of over $62 million, which Plaintiff claims entitles him to receive over $39 million as a 63% percent shareholder of that company. *Id.* ¶¶ 28, 30.  In total, Plaintiff seeks nearly $40 million in damages.

---

[1] Plaintiff has also filed separate complaints in this district against Ms. Lee and the other defendant named in the South Korean Complaint, JooHyung Lee.  *See Yoon v. Lee,* 19-cv-10278-PBS and *Yoon v. Lee,* 19-cv-10280-WGY.  The present Motion to Dismiss is equally applicable to those cases.  It is unclear why Plaintiff did not simply name Ms. Lee and Mr. Lee as defendants in this lawsuit.  For purposes of judicial efficiency, KBS intends to seek consolidation of all three cases.

The company and all its employees who were involved with the production and broadcast of the news report at issue reside and work in South Korea.  Ex. 1. ¶ 19. All those individuals communicate almost exclusively in Korean and have minimal or no English fluency, such that they all will require the assistance of interpreters for any proceeding in the United States. *Id.*

The relevant documents and evidence are all located in South Korea, including the computer networks and servers that KBS employees use to exchange emails and electronic documents that are generated in Korean. *Id.* ¶ 20.

## III.   STANDARD OF REVIEW

The Foreign Sovereign Immunities Act ("FSIA") creates the only basis for subject matter jurisdiction over claims against a foreign state and its instrumentalities. 28 U.S.C. § 1602, *et seq.* ("The Congress finds that the determination by United States courts of the claims of foreign states to immunity from jurisdiction of such court would serve the interests of justice and would protect the rights of both foreign states and litigants in United States courts"); *Argentine Republic v. Amerada Hess Shipping Co.,* 488 U.S. 428, 439 (1989). The FSIA provides a statutory presumption that a foreign government and its instrumentalities are immune from suit in the United States courts. *Universal Trading & Inv. Co., Inc. v. Bureau for Representing Ukrainian Interest in International and Foreign Courts*, 727 F.3d 10, 16 (1st Cir. 2013) (citing U.S. Supreme Court precedent). The generalized immunity provided under the FSIA is subject to a handful of narrow and specific exceptions. 28 U.S.C. §§ 1604-1605; *Verlinden B.V. v. Cent. Bank of Nigeria*, 461 U.S. 480, 488 (1983). Where, as here, none of the exceptions apply, Rule 12(b)(1) requires dismissal for lack of subject matter jurisdiction.

When presenting a factual challenge to the Court's subject matter jurisdiction under Rule 12(b)(1), "the plaintiff's jurisdictional averments are entitled to no presumptive weight and the

court will consider the allegations by both parties and resolve the factual disputes." *Holloman v. Clarke*, 236 F. Supp. 3d 493, 496 (D. Mass. 2017) (citing *Valentin v. Hospital Bella Vista*, 254 F.3d 358, 363-64 (1st Cir. 2001)). The Court is granted broad authority to conduct a factual inquiry, including the consideration of extrinsic evidence outside the record for the Court to determine its own jurisdiction. *Id.*; Fed. R. Civ. P. 43(C).[2]

Alternatively, this Court is permitted to decline its jurisdiction (assuming any exists) and dismiss this case under principles of forum non-conveniens. This equitable authority is available when (i) an alternative forum to adjudicate the parties' dispute is available, and (ii) the balance of private and public interests weighs in favor of litigating in another jurisdiction. *See, generally Mercier v. Sheraton Intern., Inc.*, 981 F.2d 1345 (1st Cir. 1992).

## IV.   ARGUMENT

### A.   KBS is Entitled to Sovereign Immunity Pursuant to the FSIA.

#### 1.   KBS is an Instrumentality of the Republic of Korea.

Subject matter jurisdiction is unavailable in this case because KBS is an instrumentality of the Republic of Korea and therefore enjoys the protection of sovereign immunity. 28 U.S.C. § 1603 (b). The presumption of immunity provided in the FSIA extends to any "agency or instrumentality of a foreign state" upon a showing of three elements:

(i)   it is a separate legal person, corporate, or otherwise; and
(ii)  it is an organ of a foreign state or political subdivision thereof, or a majority of whose share or other ownership interest is owned by a foreign state; and
(iii) it is neither a citizen of the United States, nor created under the law of a third county.

28 U.S.C. § 1603(b).

---

[2] "When a motion relies on facts outside the record, *the court may hear the matter on affidavits* or may hear it wholly or partly on oral testimony or on depositions." Fed. R. Civ. P. 43(C) (emphasis added).

All three elements are clearly satisfied here. First, KBS is a corporation formed and existing under the laws of the Republic of Korea. Second, it is a government entity whose formation, composition of management, funding, and operation are controlled by the Korean government. Third, it is obvious that KBS is neither a citizen of the United States or any third country. *See* Ex. 1 ¶¶ 3-9; Section II(A), *supra*.  Accordingly, KBS and its agents are entitled to sovereign immunity and cannot be sued in the United States.

### 2.      No Exceptions Under the FSIA Exist.

Notably, Plaintiff has the burden of demonstrating that the FSIA does *not* apply. When a party has satisfied its burden of showing that it is entitled to sovereign immunity, as KBS has done here, the burden shifts to the other party to demonstrate one of the specific exceptions under the FSIA are applicable. *Anglo-Iberia Underwriting Mgmt. v. P.T. Jamsostek*, 600 F.3d 171, 175 (2d Cir. 2010); *Kato v. Ishihara*, 360 F.3d 106, 107-08 (2d Cir. 2004) ("The FSIA codifies the restrictive theory of sovereign immunity, under which foreign sovereigns and their agencies or instrumentalities enjoy immunity from suit in United States courts, subject to a few, enumerated statutory exceptions") (internal citations and alterations omitted); *Universal Trading*, 727 F.3d at 17 (applying the burden-shifting framework to the case previously adopted by the Second, Third, Fourth, Fifth, Seventh Ninth, Tenth, Eleventh and D.C. Circuits). The final analysis requires the foreign sovereign to meet its burden based on "[a] review of the allegations in the complaint, the undisputed facts, if any, placed before the court by the parties, and – if the plaintiff comes forward with sufficient evidence to carry its burden of production on this issue – resolution of disputed issues of fact." (internal cites and quotes omitted).  *Id*.

In determining which exceptions could apply, the United States Supreme Court has explained, "[w]e begin our analysis by identifying the particular conduct on which the

[Plaintiff's] action is 'based' for purposes of the act." *Saudi Arabia v. Nelson*, 507 U.S. 349, 356-57 (1993) (holding the expression "based upon" means "those elements of a claim that, if proven, would entitle a plaintiff to relief under his theory of the case"). It is anticipated that Plaintiff might attempt to assert that one of two exceptions under the FSIA applies – (i) the "commercial activity" exception, 28 U.S.C. § 1605(a)(2), or (ii) the "tortious activities" exception, 28 U.S.C. § 1605(a)(5).

### a. The Alleged Conduct Does Not Constitute "Commercial Activity" Under the FSIA.

The FSIA commercial activity exception must be based (i) "upon a commercial activity carried on in the United States by the foreign state;" or (ii) "upon an act performed in the United States in connection with a commercial activity of the foreign state elsewhere;" or (iii) "upon an act outside the United States in connection with a commercial activity of the foreign state elsewhere that causes a direct effect in the United States." 28 U.S.C. § 1605(a).  A "commercial activity" is defined as "either a regular course of commercial conduct or a particular commercial transaction or act.  The commercial character of an activity shall be determined by reference to the nature of the course of conduct or particular transaction or act, rather than by reference to its purpose."  28 U.S.C. § 1603(d); *Republic of Argentina v. Weltover, Inc.,* 504 U.S. 607, 614-15 (1992) (explaining that the "nature" of a state's decision relates to the outward conduct shown, whereas "purpose" relates to the reasons and motivations why the foreign state engages in the activity).

Plaintiff has failed to plead any facts showing that the nature of the conduct or transaction committed by KBS represents commercial activity.  First, as to Count I, Plaintiff alleges that a KBS employee secretly recorded a conversation with him in violation of the Wiretap Statute.

The "nature" of an act of secret recording is not in any way based upon commercial conduct, and therefore this exception is plainly not applicable to Count I of the Complaint.

Second, the defamation and trade libel claims (Counts II and III), which are based on news reports that aired in South Korea, fail under the commercial activity exception, because the reports did not cause a "direct effect in the United States." 28 U.S.C. § 1605(a); *see also Bell Helicopter Textron, Inc. v. Islamic Republic of Iran*, 734 F.3d 1175, 1183-84 (D.C. Cir. 2013) (holding "reputational harm . . . is too remote and attenuated to satisfy the 'direct effect' requirement of the FSIA") (quoting *Weltover, supra* at 618); *Antares Aircraft, L.P. v. Feder Alpha Therapeutic Corp v. Nippon Hoso Kyokai*, 199 F.3d 1078 (9th Cir. 1999), *withdrawn on other grounds*, 237 F.3d 1007 (9th Cir. 2001). Although withdrawn pursuant to a stipulation of the parties, and therefore without the same precedential value, the Ninth Circuit's decision in *Alpha Therapeutic* is nonetheless instructive given the remarkable similarity to the facts of this case. There, like here, plaintiff asserted claims for, *inter alia,* slander and trade libel, based on the broadcast of two programs (one of which defendant broadcast in Japan) that contained allegedly defamatory statements. *Id.* at 1082. The court in *Alpha Therapeutic* affirmed dismissal of the claim arising out of the broadcast in Japan, holding the commercial activity exception did not apply because the broadcast did not have a "direct effect" on the plaintiff, a United States corporation. *Id.* at 1086. As the court explained, "[m]ere financial loss suffered in the United States as a result of the action abroad by a foreign state does not constitute a 'direct effect' and thus does not create subject matter jurisdiction under the FSIA." *Id.* (citing *Adler v Federal Republic of Nigeria*, 107 F.3d 720, 726-27 (9th Cir. 1997) and *Gregorian v. Izvestia*, 871 F.2d 1515, 1527 (9th Cir. 1989)). *"*Additionally, injury to feelings suffered in this country by a wrongful act in a foreign country is also not a 'direct effect.'" *Id.* (citing *Berkovitz v.*

*Islamic Republic of Iran*, 735 F.2d 329, 332 (9th Cir. 1984)).  The court continued, "Rather, to

establish a 'direct effect' in the United States resulting from an act abroad by a foreign state,

Appellants must establish that 'something legally significant actually happened in the U.S.'"  *Id.*

The same exact reasoning applies with equal force here.  KBS broadcast the allegedly

defamatory news reports in South Korea, not the United States.  Accordingly, any alleged injury

to Plaintiff who is currently residing in the United States is indirect at best.  Indeed, the alleged

injury in the present case is even more indirect than in *Alpha Therapeutic*, because here, the

corporate entity that was allegedly the victim of trade libel (Genesis BBQ) is a foreign

corporation.  As such, nothing "legally significant actually happened in the U.S."  *Alpha

Therapeutic, supra*, at 1086.  The commercial activity exception of the FSIA, therefore, does not

apply to any of Plaintiff's claims.

### b.   Plaintiff's Claims are Specifically Excluded from the FSIA's Tortious Conduct Exception.

By its express terms, the language of the tortious conduct exception does not apply to

claims for defamation and libel.  *See* 28 U.S.C. § 1605(a)(5)(B) (excepting from the exception

"any claim arising out of malicious prosecution, abuse of process, *libel*, *slander*,

misrepresentation, deceit, or interference with contract rights."  (Emphasis added).  Furthermore,

Plaintiff's claim under the Wiretap Statute fails because it "arises out of" claims involving

"deceit." 28 U.S.C. § 1605(a)(5)(B).[3]  The enumerated exclusions to the tortious activity

exception, therefore, render this Court without subject matter jurisdiction over Plaintiff's claims.

In sum, there is no exception available under the FSIA to grant this Court subject matter

jurisdiction. This outcome mandates that the pending action be dismissed.

---

[3] *But see Doe v. Federal Democratic Republic of Ethiopia*, 189 F. Supp. 3d. 6 (D.D.C. 2016) (holding Maryland invasion of privacy tort not barred by FSIA).

B.     **The Court Should Dismiss this Case Pursuant to the Doctrine of** *Forum Non Conveniens.*

Even if the Court determines subject matter jurisdiction is proper on some or all of Plaintiff's claims, the Court should exercise its broad discretion and dismiss this case pursuant to the doctrine of forum non conveniens.  "If 'a foreign tribunal is plainly the more suitable arbiter of the merits of the case,' a court may dismiss for forum non conveniens without resolving whether it has subject matter jurisdiction." *Imamura v. General Electric Company*, --- F. Supp. 3d --- , 2019 WL 1513454, at *4  (D. Mass. Apr. 8, 2019) (quoting *Sinochem Intern. Co. Ltd. v. Malaysia Intern. Shipping Corp.*, 549 U.S. 422, 429 (2007)).  *See also Nowak v. TakHow Invs., Ltd.,* 94 F.3d 708, 719 (1st Cir. 1996) (explaining the practical factors a trial court is permitted to consider).  "Forum non conveniens permits dismissal of a case, even if the court has jurisdiction, when 'an alternative forum is available in another nation which is fair to the parties and substantially more convenient for them or the courts.'" *Imamura*, *supra* at 4 (quoting *Mercier*, 981 F.2d at 1349).  In making its determination, the Court considers: (i) whether an adequate alternative forum exists; and (ii) the weighing of certain private and public interest factors.  *See Nowak, supra.*

1.     **Plaintiff's Filing of the South Korean Lawsuit Confirms That Country is an Adequate Forum for Resolution of Plaintiff's Claims.**

"The *sine qua non* of forum non conveniens is the existence of an adequate alternative forum." *Imamura*, *supra* at *4 (citing *Associacao Brasileira de Medicina de Grupo v. Stryker Corp.*, 891 F.3d 615, 620 (6th Cir. 2018)).  Given Plaintiff's decision to *first* file a virtually identical lawsuit in South Korea against KBS, there can be no debate that an adequate alternative forum exists in that country. *See* Section II(B), *supra*; Ex. 1, ¶¶ 13-15.  Indeed, the South Korean Complaint, which alleges the same facts and seeks money damages, confirms that South Korean

13

courts provide an adequate forum for determination of Plaintiff's claims with adequate

procedural protections to assure due process for the parties. *Id.* ¶¶ 23-24.

Chief Judge Saris's recent decision in *Imamura* is instructive. There, plaintiffs sued

General Electric Co. ("GE") seeking monetary damages for property damage and economic harm

caused by the 2011 tsunami and resulting nuclear disaster at the Fukushima Daiichi Nuclear

Power Plant in Japan. *Imamura, supra* at *1. Plaintiffs alleged that GE negligently designed the

power plant's nuclear reactors and safety mechanisms. *Id.* Under Japan's compensation system,

only the Tokyo Electric Power Company was liable for damages arising from the nuclear

disaster. *Id.* at *2. In other words, plaintiffs had absolutely no recourse for their claims against

GE in Japan. Nonetheless, the Court dismissed plaintiffs' claims against GE in the U.S. pursuant

to the doctrine of forum non conveniens, finding an adequate alternative forum existed in Japan.

*Id.* at *4-5. Relying on Supreme Court precedent, Chief Judge Saris held that the adequate

alternative forum analysis requires only that the alternative forum provide something more than

"no remedy at all." *Id.* at *4 (citing *Piper Aircraft Co. v. Reyno*, 454 U.S. 235, 254 (1981)). As

the Court held in *Piper*, "Although the relatives of the decedents may not be able to rely on a

strict liability theory, and although their potential damages award may be smaller, there is no

danger that they will be deprived of *any* remedy or treated unfairly." *Id.* at 254-55 (emphasis

added). Explaining the Court's reasoning in *Imamura* for finding that Japan constituted an

adequate alternative forum even though Plaintiffs could not sue GE there, Chief Judge Saris

wrote:

> In the cases Plaintiffs cite, however, the courts did not directly address the
> question presented here of whether the foreign forum must permit a remedy
> against the specific defendant sued in the American litigation where the forum
> provides an adequate remedy from another party or entity. Based on the language
> of *Piper* and the persuasive reasoning of the administrative compensation cases,

the answer to this question is 'no,' so long as the alternative forum provides an adequate remedy.

*Id.* at 5.

If dismissal under forum non conveniens is proper when plaintiffs have absolutely no remedy at all against the defendant they have sued in the U.S., then clearly it is proper where, as here, Plaintiff has an ongoing (and previously-filed) lawsuit against KBS pending in South Korea.  Moreover, this case presents an especially compelling case for the Court to exercise its discretion and dismiss the case under the doctrine of forum non conveniens, because as set forth further below, South Korea represents a *superior* jurisdiction for resolution of Plaintiff's claims. Section II(C), *supra*; Ex. 1, ¶¶ 23-24 (describing the South Korean justice system).

### 2.     The Private and Public Interest Factors Weigh in Favor of Dismissal.

An evaluation of the private and public interest factors reflects a trial court's assessment of a range of issues, "most notably the convenience to the parties and the practical difficulties that can attend the adjudication of a dispute in a certain locality." *Sinochem*, 549 U.S. at 429 (citing to other Supreme Court precedent). Typically, there is a presumption in favor of a plaintiff's chosen forum. This is diminished when a plaintiff elects a forum that is not its "home" jurisdiction. *Id.*; *Piper*, 445 U.S. at 255-56.  "The plaintiff's choice of forum also receives less deference if it appears motivated by forum shopping."  *Imamura*, at *7 (citing *Interface Partners Int'l Ltd. v. Hananel*, 575 F.3d 97, 102 n.9 (1st Cir. 2009)).

Specific private factors include but are not limited to: (i) the relative ease of access to proof and evidence, (ii) the availability and costs of compulsory process for attendance of witnesses, (iii) the comparative costs for trials, (iv) the ability to enforce a judgment, particularly in the forum where a judgment is secured, and (v) other practical problems that would make trial cumbersome, time-consuming, or costly. *Nowak*, 94 F.3d at 719; *Iragorri v. Intern. Elevator,*

*Inc.*, 203 F.3d 8, 12 (1st Cir. 2000). The types of public factors considered include but are not limited to: (i) the administrative burdens on the Court's docket, (ii) the local interest in adjudicating the lawsuit, (iii) the avoidance of unnecessary choice of law or foreign law questions, and (iv) the unfairness of jury duty for citizens in an unrelated forum. *Nowak*, *supra* at 719. This list of factors is "illustrative rather than all-inclusive" and constitutes "a helpful starting point." *Iragorri*, 203 F.3d at 12.

The balancing of these factors here militates strongly towards dismissal of this case in favor of litigation in South Korea, where Plaintiff first filed his claims against KBS.

### a.      Private Factors

#### i.      Relative ease of access to evidence and proof

The location of relevant documents and electronic files, including computer servers containing such information, are all located in South Korea. *See* Ex. 1 ¶ 20. To secure this data and information abroad and import it to the United States would impose a needless cost on KBS, which is already defending against the same allegations in South Korea. In addition, this case necessarily will require securing evidence from third-party foreign financial institutions that are outside the jurisdiction and subpoena authority of this Court, a fact also applicable to factor number two, *infra*. *Id.* ¶ 22. Such evidence includes company financial data for Genesis BBQ, a corporation located in South Korea, which allegedly sustained a massive drop in revenue due to the broadcasts at issue. Compl. ¶ 22-23. Virtually all the witnesses who have relevant knowledge are in South Korea. Ex. 1 ¶ 19. Finally, the cost to KBS of coordinating with counsel in the United States will be costly, restrictive, and impose arbitrary barriers that will frustrate the adjudication of this case.

### ii.    Availability and costs for compulsory attendance

As previously stated, all known witnesses, except for Plaintiff, reside in South Korea. Section II(B), *supra*. Accordingly, critical witnesses such as the people featured in the KBS broadcasts, including the handwriting expert interviewed as part of the broadcast and the officers and executives of Genesis BBQ who have knowledge of the alleged damages, are not subject to compulsory attendance at deposition and/or trial. The ability to secure their testimony and subpoena relevant documentation will be difficult if not impossible, since they are all located in South Korea. *Id.* ¶ 19.  In addition, Plaintiff is a Korean citizen whose current presence in the United States derives from a work visa issued to him to work for BBQ in the United States.

### iii.    Comparative trial costs

The costs for securing information related to the claims and defenses will be significant if forced to litigate in the United States. *See* Ex. 1 ¶¶ 17-19. In addition to the procedural and practical barriers imposed by litigating on two continents, KBS will be subjected to two different discovery standards. *Id.* ¶ 24. In effect, by seeking two bites at the apple, Plaintiff also is seeking to impose two different sets of rules with regards to discovery, which necessarily means discovery conducted in the United States and South Korea will not promote judicial economy despite the lawsuits essentially being the same.  In addition, at the trial stage, the parties will incur substantial costs in travel, accommodations, and related expenses to usher witnesses from the other side of the globe to Boston. Such a cost and burden are entirely avoidable by having this matter litigated in South Korea, where Plaintiff filed his initial lawsuit three months earlier.

### iv.    Ability to enforce a judgment

Plaintiff's ability to enforce a judgment in the United States is questionable.  KBS is a South Korean corporation with few assets inside the United States.  *See* Ex. ¶ 21.  Those assets

include leased office space in New York City and Washington, D.C. for its foreign correspondents. *Id.* Those assets are *de minimus* compared to the damages Plaintiff is seeking in this case. *Id.* Any judgment secured in the United States would need to be domesticated in South Korea through the filing of a separate action. *Id.* On the other hand, Korean law provides that a judgment obtained in that country is automatically enforceable. *Id.*

> **v.     Other practical problems—translation costs, travel expenses**

The list of needless, tedious difficulties that will be imposed on the parties are substantial, including costly translation services and travel expenses. All such problems would be alleviated adjudicating this matter in South Korea.

> **b.     Public Factors**

> **i.     Administrative burdens on the Court's docket**

The nature of this case will necessarily impose the same language translation and coordination problems on the Court that the parties, especially Defendant, will confront in adjudicating this case. In particular, the limitations imposed on the parties' ability to secure documents and witness testimony in South Korea creates a real risk that the record will be incomplete. While South Korea has signed the Hague Convention of 18 March 1970 on the Taking of Evidence Abroad in Civil and Commercial Matters, it has specifically issued a reservation that a Letter of Request issued for purposes of obtaining pre-trial discovery will not be honored. *See* Ex. 1 ¶ 22. This, in turn, potentially burdens the Court to decide dispositive motions and make evidentiary decisions without a complete record. Again, such burdens would be relieved if this action is dismissed, and the South Korean Lawsuit proceeds.

### ii.   Local interest in adjudicating the lawsuit

There is no particular local interest in adjudicating the lawsuit in Massachusetts, as opposed to South Korea, where Plaintiff filed a virtually identical lawsuit three months earlier. Indeed, as discussed above, South Korea provides a superior forum for adjudicating Plaintiff's claims.  The gravamen of the harms is alleged to have occurred in South Korea, not the United States. The fact Plaintiff asserts a claim under the Wiretap Statue does not change this fact, where Plaintiff alleges that he incurred most of his damages from common law violations of libel and slander based on reports aired on South Korean television, which allegedly caused harm to a Korean company. Thus, the minimal local interest presented favors adjudicating this matter in South Korea.

### iii.   Avoidance of unnecessary choice of law questions

It is unclear what law applies to Plaintiff's claims arising out of allegedly defamatory broadcasts in South Korea.  Moreover, it is likely that complicated motions to compel and/or quash will be filed regarding the ability to secure documents that will be necessary to develop a complete record. These types of discovery disputes would be less likely to arise in a forum where the evidence and witnesses are located. Accordingly, this factor also weighs in favor of adjudicating this matter in South Korea.

### iv.   Avoidance of forum shopping

In litigating the same case in South Korea *and* the United States, Plaintiff is clearly—and inappropriately—forum shopping.  His dual lawsuits also present the significant problem of inconsistent results.  This fact, perhaps more than any other, weighs heavily in favor dismissing this case and requiring Plaintiff to pursue relief in the forum where he originated litigation –

South Korea. *See Interface Partners Int'l*, 575 F.3d at 102 n.9 (explaining that plaintiff's choice of forum receives less deference if it appears motivated by forum shopping).

## V.    CONCLUSION

Pursuant to the FSIA, the Court lacks subject matter jurisdiction over this case. Alternatively, the Court should decline to exercise its jurisdiction and dismiss the case in its entirety under the doctrine of forum non conveniens.

Respectfully submitted,

Korean Broadcasting System

By its attorneys

/s/
*Douglas S. Brooks*
Douglas S. Brooks (BBO No. 636697)
LIBBYHOOPES, P.C.
399 Boylston Street
Boston, MA 02116
(617) 338-9300
dbrooks@libbyhoopes.com

Dated:  May 6, 2019

## CERTIFICATE OF SERVICE

I hereby certify that this document filed through the ECF system will be sent electronically to the registered participants as identified on the Notice of Electronic Filing (NEF) and paper copies will be sent to those indicated as non-participants on May 6, 2019.

/s/ Douglas S. Brooks
Douglas S. Brooks